# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 8, 2008 Session

## STATE OF TENNESSEE v. ADELL WATKINS

**Direct Appeal from the Circuit Court for Madison County**
**No. 06-500     Roy B. Morgan, Jr., Judge**

---

**No. W2007-00691-CCA-R3-CD  - Filed June 25, 2008**

---

The defendant, Adell Watkins, was indicted for one count of the knowing sale of cocaine and for one count of knowingly and unlawfully delivering cocaine, a Schedule II controlled substance. She was convicted on both counts. Her convictions were merged and she received an eight-year sentence. The defendant argues on appeal that the evidence was insufficient to sustain her convictions. Following our review of the parties' briefs, the record, and the applicable law, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Adell Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jerry Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. BACKGROUND

Officer Wes Stilwell testified that he was a member of the Jackson Police Department and had been assigned to the Metro Narcotics Unit for four-and-a-half years. He stated that he worked with Cathy Maxwell, a confidential informant, during an investigation in July of 2005 which led to the defendant's arrest. Ms. Maxwell participated in the investigation which initially targeted Clifford Watkins, an individual suspected of dealing drugs.[1] Officer Stilwell stated that the police supplied Ms. Maxwell with forty dollars to fund the purchase of drugs from Clifford. Ms. Maxwell and her vehicle were searched to make sure she was not in possession of any drugs or money before

---

[1] Because two of the witnesses and the defendant share the same last name, we will refer to those individuals by their first name in order to avoid confusion. No disrespect is intended to any person described or discussed herein.

assisting police in the undercover investigation. In addition, Officer Stilwell placed an audio and video transmitter, a "wire," on Ms. Maxwell so that officers could hear and observe the transactions between Ms. Maxwell and Clifford. Officer Stilwell testified that he purposefully withheld from Ms. Maxwell the fact that the device she was given also performed video surveillance. According to Officer Stilwell, confidential informants were typically not informed that the transmitter had video capability. This was done in order to insure that if the informant attempted to conceal drugs or money from police officers, they would be caught on video.

Officer Stilwell testified that once Ms. Maxwell was wired, she placed a phone call to Clifford. Clifford told her that he had "four tens" of crack cocaine and told her to come to his house at 129 Craig Street.[2] Ms. Maxwell drove toward Clifford's house to complete the sale when she spotted him at a nearby gas station. Ms. Maxwell approached Clifford in her car and asked him if he had the cocaine. Clifford told Ms. Maxwell that he did not have the cocaine with him. Clifford told Ms. Maxwell to go to his house and described the exact location of the drugs. "It's in my bedroom closet. It's in my white and yellow Nikes. Go see Mama [the defendant]."

Officer Stilwell testified that he followed Ms. Maxwell to the defendant's house on Craig Street, and the defendant answered the door. Officer Stilwell stated that on the video, Ms. Maxwell and the defendant could be seen walking down the hallway to Clifford's bedroom. Ms. Maxwell stopped at the door to the bedroom while the defendant entered the room and obtained the drugs. Moments later, Ms. Maxwell received the crack cocaine from the defendant, thanked the defendant, and exited the house. After meeting Officer Stilwell at a secure location, Ms. Maxwell was searched again. Officer Stilwell confirmed that she had the same amount of cocaine that she was given by the defendant, and she was no longer in possession of the forty dollars supplied by officers to purchase the drugs. Officer Stilwell stated that Ms. Maxwell purchased "four tens" from the defendant. The cocaine taken from Ms. Maxwell was sent to the Tennessee Bureau of Investigation for analysis. Test results revealed that the defendant sold Ms. Maxwell a total of .03 grams of cocaine.

On cross-examination, Officer Stilwell testified that Ms. Maxwell approached him about working as a confidential informant. Ms. Maxwell was paid forty dollars for her services. He stated that Ms. Maxwell was not working as a confidential informant in exchange for favorable treatment on any pending drug charges. Officer Stilwell was unaware that Ms. Maxwell had frequently and routinely purchased drugs from Clifford and the defendant in the past. Officer Stilwell was also unaware that any conversation about money took place during Ms. Maxwell's transaction with the defendant. However, Officer Stilwell questioned Ms. Maxwell after the transaction, and she informed him that she had given the forty dollars for the drugs to the defendant at the same time the defendant placed the drugs in her other hand. Officer Stilwell testified that Ms. Maxwell was in the house a very short period of time.

---

[2] Officer Stilwell testified that "four tens" or "four dimes" of crack cocaine equaled roughly four $10 "rocks" of crack cocaine.

Cathy Maxwell testified that she volunteered her services to the police department because she had gotten "cleaned up" and wanted to do something good for the community. She agreed to wear a wire and participate in the undercover purchase of narcotics. After police equipped her with the wire, she called Clifford and asked to buy a gram of crack cocaine. Clifford told her that he did not have a gram of cocaine, but he did have four tens and instructed her to meet him at his house. On her way to Clifford's house, she spotted him at the corner gas station. He instructed her to go to his house and get the four bags of cocaine out of a shoe in his closet.

Ms. Maxwell testified that the defendant answered the door and told Ms. Maxwell to come in the house. The defendant shut the door and led Ms. Maxwell down the hall to Clifford's bedroom. Ms. Maxwell testified that she stopped at the door to the bedroom while the defendant went in, retrieved four plastic bags of crack cocaine, and placed them in Ms. Maxwell's right hand. At the same time, Ms. Maxwell gave the defendant the forty dollars supplied to her by Officer Stilwell with her left hand and thanked the defendant. Ms. Maxwell was followed down the hallway by the defendant as she left the house.

Ms. Maxwell testified that after leaving the defendant's house, she met Officer Stilwell and other police officers at a secure pre-arranged location. She turned over the crack cocaine she received from the defendant to Officer Stilwell. She and her car were searched again to verify that she was not withholding any money or drugs. She stated that she was not offered any deals by police officers and was given nothing in exchange for her testimony. She stated that she did not see the defendant get the cocaine out of the shoe, but she did see the defendant go into the closet to get it. She also stated that she was not aware that the transmitter placed on her by police had video recording capability.

On cross-examination, Ms. Maxwell testified that when she arrived at the defendant's door, she told the defendant that Clifford had instructed her to come to the house and "get it . . . [i]t's in the bedroom in his shoe." Ms. Maxwell stated that she did not use the word "crack," but stated that the defendant knew what Ms. Maxwell was referring to when she said "get 'it.'" Ms. Maxwell stated that she had been clean for a few months prior to the investigation. Ms. Maxwell admitted that while she was addicted to crack cocaine, she relinquished custody of her children to her mother. Ms. Maxwell also admitted that she had experimented with marijuana and had lied about her drug use in the past. She stated that since becoming clean, she had participated in three separate drug transactions for police officers and received a total of $120 for her work. Ms. Maxwell had known the defendant for approximately ten or twelve years and had known the defendant's son since he was a small boy. Ms. Maxwell testified that she went to the defendant's house on several prior occasions to buy drugs and that the original plan was to conduct a transaction with Clifford at the defendant's house.

Crystal Watkins testified that she was at the defendant's house when Ms. Maxwell arrived. Shortly after Crystal and the defendant finished hosting a birthday party for Crystal's niece, Ms. Maxwell barged into the house, stated that "Clifford sent me over here to get four dimes" or "four tens," and began walking down the hall to Clifford's bedroom. Crystal stated that at that time, the birthday party had ended and she and the defendant were cleaning up in the kitchen. Crystal also stated that the defendant never left the kitchen while Ms. Maxwell was in the house. Crystal did not

3

see Ms. Maxwell go into her brother's bedroom, but she saw her leave his bedroom and leave the house quickly. According to Crystal, the defendant followed Maxwell out of the house to take the trash to the curb.

On cross-examination, Crystal Watkins denied that the defendant opened the door and allowed Ms. Maxwell in the house. She also stated that she did not see the defendant hand Ms. Maxwell any drugs or accept any money from her. However, Crystal admitted that she could not be heard or seen on the video or audiotape and that she did not acknowledge or speak to Ms. Maxwell. She also admitted that there was no evidence that she was even in the house on July 2, 2005, the date the crime was committed.

Clifford Watkins testified that he wanted to testify despite having recently turned himself into police custody for the same offense for which the defendant was being tried. After being advised of his rights and waiving his Fifth Amendment protection against self-incrimination, he offered the following testimony. Clifford stated that he considered himself to be close to Ms. Maxwell and treated her "like a sister." Clifford stated that he had helped take care of Ms. Maxwell's father and had run errands to provide items for Ms. Maxwell's sister when she was sick with cancer. He stated that Ms. Maxwell had a problem with cocaine. According to Clifford, Ms. Maxwell would call him frequently to obtain crack cocaine, sometimes up to three or four times a day. Clifford stated that he had allowed her to purchase drugs on credit several times because she did not have the money to pay him.

Clifford testified that Ms. Maxwell called, asked for a gram of crack cocaine, and stated that she wanted to purchase it on credit. He told her he could not provide a gram of cocaine but, he had "a little piece" at his house. He testified that he went down to the corner gas station in order to avoid having to deal with Ms. Maxwell. He admitted that he had some cocaine, along with some marijuana, in a shoe in his closet in his bedroom at his mother's house. When he got back to his house, Clifford checked the shoe and saw that all of the cocaine and marijuana had been taken. Clifford stated that he did not receive any money from Ms. Maxwell and was not given any money by the defendant. Clifford stated that he expected to be paid by Maxwell later that evening. He testified that he did not tell the defendant that he had the drugs because he feared that she would kick him out of the house. Clifford also testified that he was confronted by Ms. Maxwell at the gas station, and he asked her "[D]id my mama give it to you?" According to Clifford, he was not referring to drugs. Rather, he was referring to a birth certificate or identification card which belonged to Ms. Maxwell's son which she had entrusted to the defendant's care some time before.

On cross-examination, Clifford testified that he sold crack cocaine to Ms. Maxwell every time she called. He stated that the defendant did not know anything about his drug business. Clifford admitted that there was no reference to purchasing cocaine on credit on the audiotape. Clifford also admitted that there was no reference on the audiotape to identification cards or birth certificates. In addition, Clifford stated that Ms. Maxwell made three phone calls to him that day and that not all of the phone calls were recorded. Clifford noted that he agreed to testify because the defendant's arrest was his fault and he wanted to take responsibility for the crime.

4

After the jury found the defendant guilty of the indicted offenses, the two counts were merged and she was convicted of one count of the sale and delivery of cocaine, a Schedule II controlled substance, a Class C felony. The defendant was sentenced as a multiple offender to eight years in confinement and assessed a fine of $40,000. After entry of the judgment, the defendant filed a timely notice of appeal.

## II. ANALYSIS

On appeal, the defendant argues that there was insufficient evidence to support her convictions for the sale and delivery of cocaine.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

When viewed in a light most favorable to the state, the evidence in the record shows that the defendant knowingly delivered and sold four bags of crack cocaine to Ms. Maxwell, the confidential informant on July 2, 2005. Ms. Maxwell approached police with information about the defendant's son, Clifford, who sold drugs. Ms. Maxwell knew both the defendant and Clifford because she had regularly purchased cocaine from them in the past. The evidence indicated that Ms. Maxwell was thoroughly searched prior to the transaction and immediately afterward. Ms. Maxwell contacted Clifford to arrange the transaction. Police officers monitored Ms. Maxwell's conversation with Clifford at the gas station. Officers heard Clifford tell Ms. Maxwell that the cocaine could be found in a shoe inside a closet in his bedroom at the defendant's house. Officers monitoring Ms. Maxwell were able to observe the defendant lead Ms. Maxwell to Clifford's bedroom and retrieve the cocaine from the closet. Ms. Maxwell was searched after the transaction and it was determined that she was not in possession of any drugs or money, and that the forty dollars provided by police had been used to complete the sale.

The record also indicates that jurors heard testimony from defense witnesses aimed at impeaching Ms. Maxwell's credibility. The jury was informed of Ms. Maxwell's prior addiction to crack cocaine, the fact that she had relinquished control of her children due to the severity of her addiction, and the fact that she had lied about her addiction in the past. Jurors were also informed about the payment Ms. Maxwell received for her services as a confidential informant and how many times she had worked with the police. The jurors, as the triers of fact, were able to judge Ms. Maxwell's credibility as a witness. *See Bland*, 958 S.W.2d at 659. By its verdict, it is apparent that the jury found Ms. Maxwell's testimony to be credible. Additionally, jurors were able to view portions of the audio and video surveillance and evaluate the testimony of witnesses against the information gleaned from those recordings. Because we do not replace the jury's inferences with our own, we conclude that the evidence was sufficient to support the jury's verdict and sustain the defendant's conviction. *See State v. Reid*, 91 S.W.3d at 277. Therefore, the defendant's argument is without merit and she is not entitled to relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE

6